Good morning, Justice Souter, Judge Barron, Judge Lopez. Nicholas Occhiuto was convicted of one count of heroin distribution and one count of conspiracy to distribute heroin in a trial in 2012, and he challenges those convictions in this appeal. My name is John Thompson. I represent Mr. Occhiuto. The first issue that I'd like to address the court on is the confrontation clause issue that we raised regarding the testimony of Special Agent Jeffrey Wood. This concerns the October 5, 2009 distribution count in which it's alleged that Mr. Occhiuto sold an amount, pardon me, of heroin to a confidential informant named Tiffany McIntyre, who was a person that the government chose not to present as a witness. The problem that created is that Ms. McIntyre was the only person who knew whether the material that she turned over to Special Agent Wood was the material that she bought from Mr. Occhiuto. Well, that is true unless the government's argument is sound to the effect that the combination of surveillance and timing, which an independent federal agent took responsibility for, was such that no other substance could have been turned ultimately over except the substance that your client sold. I mean, what is your response to that argument? I think it's important, Justice Souter, to understand what the attempted control procedure was and to understand what Ms. McIntyre's background and record of performance was. And one of the reasons that she was not presented as a witness was that in the time between this transaction and trial, additional information came out. And I say additional information because the government knew at the time that they decided to use her as their purchasing agent that she was an unreliable person. No, we know that, but that does not respond to my question. My question is the government's argument is that by surveillance and careful timing, no other drugs could have been in her hand to turn over to the agents ultimately except the drugs that your client sold. That's a factual argument. Is that unsound? It is unsound, Justice Souter. The control procedure left opportunities for Ms. McIntyre to circumvent it. Because the bra and the panties were not searched? Because her body was not searched effectively. Well, those were the only two places, weren't they? Well, it's not clear. It says that I think Agent Wood testified that he searched her person, although he didn't describe how. But he did say that he did not search her breast area or her crotch area. And he testified that those are areas where drugs are commonly secreted by drug users and drug dealers. So that created the possibility that she came to the transaction with the drugs on her person, and if that was the case and they were not detected, all of the rest of the control procedures were ineffective. That might be a sufficiency of the evidence challenge, but how does that become a confrontation clause objection? In other words, you're pausing because his testimony of what he observed might not have been enough to convince one that the drugs couldn't have been wrong as to what he's saying he observed. But for a confrontation clause, you need to be saying, I think, that his testimony can only be understood as a representation of what she told him. That is what I'm saying. But why does one have to conclude that? I mean, he testified as he testified. Yes. He doesn't say, I relied on what she told me. No, he doesn't. So then, if he just testifies that way, you could make an argument, his testimony standing alone is insufficient, but why do we have to conclude necessarily the only thing he could have been saying is what she represented to him? Because we know that he could not say from personal knowledge that the material that she handed him was the material that O'Keeffe told him. I guess what I'm pressing is he could be wrong. He could have an overinflated idea of what he observed, and that might support an argument to the jury that you should discount what he said. But that doesn't mean when he testified he was necessarily relying on representations by her or that the jury would have had to understand that he was. Well, this was a bench trial, Judge Barron. The judge would have had to understand that. But his testimony and his opportunity to observe do not match. That is, it was not only the fact that Ms. McIntyre was not thoroughly searched, but the transaction took place in her car under the view of an audiovisual surveillance. She was not on camera at any time while she was in the car. The camera was in such a position that it was focused on the passenger seat where Mr. O'Keeffe ended up being. And so it wasn't possible for him to observe what she did after the transaction was over. That is, after the transaction was over and she dropped Mr. O'Keeffe off at the place where they had originally met, the gas station, then she drove to another location where she rendezvoused with Agent Woods. So there was a second opportunity. Okay, but there again, doesn't that go to the weight of the evidence, to the sufficiency of the logic and the observed experience as opposed to the confrontation clause? I don't think it does, Justice Breyer. As the judge has already said, he doesn't say, I'm filling in the gaps based on what she told me. It may be that there are gaps. And if they are, it's up to the jury to decide, the judge in this case, to decide whether the gaps are enough, in effect, to wreck the state's case. But there is no representation that he is relying upon her testimony. There is not a representation that he's relying on her testimony, but there is the circumstance that, number one, he did not see what she, he didn't know what she had on her or whether she had anything on her when she went to, when she got in her car, after she was searched. And he didn't see what she did after she made the purchase, between the time she made the purchase and the time that she turned material over to him. And he was asked directly, was that while a photograph, or while a still of Mr. Acuto with the material in his hand, Agent Wood was asked directly, did Ms. McIntyre give you that heroin that was in that bag? And he said yes. He didn't say, I believe so. I infer that she did. She probably did. He said, yes, she did. He didn't have that personal knowledge. He had, though, and he testified, that as soon as he rendezvoused with her, he debriefed her. He debriefed her. He wrote a report. And he, and I think it was Officer Withrow, testified that information that she gave, that Ms. McIntyre gave to Agent Wood, was in that report because he read it too. So there's a strong inference that his information came from her. She's the only one who knew that. He couldn't have known it himself. He did talk to her. Logically, she said, he asked her, is this what he gave you? And she said yes. The only reason the government had to go through these contortions is they didn't want to present their firsthand witness. This is, and what they did was try to finesse the confrontation clause in order to avoid having Ms. McIntyre testify and fill the hole in their case that that decision created. This is a circumvention of the confrontation clause that should not be facilitated by drawing inferences that the witness was not saying what he actually said. He said directly. Do we have in the record notes, representations about what the debriefing notes show as to what she said? I don't believe that is in the record, Judge Barron. Just the fact that he debriefed her and that from his, that he's the only one who wrote reports of this transaction. So as the record comes to us, it's possible that the debriefing was, did you meet with him? Yes. Could you hand me over what you have? She says yes. He still wouldn't have had to rely on any representation that she was saying, what you gave me is what I gave him when I got back, et cetera, right? That's a possibility, Judge Barron, but why would he debrief her that way? That is the whole purpose of the debriefing. Whose burden is it to show that there was some representation that necessarily was relied on? Your case, I guess, depends on us concluding that he necessarily was testifying to a representation she made, right? Yes. Okay. So how? He has no other way of knowing the way he stated that. He did not state in some conditional way that he thought this was what she got from a QTIL. He said directly, this is what she got from a QTIL. There's no other way for him to know that. So either he was testifying falsely, in a sense, or certainly misleadingly. And I think it's important to remember that the whole purpose of this arrangement was to avoid having to put her on the witness stand. On the witness stand, obviously, that's one of the things that would have been established through her. Any capable prosecutor would have had her say, yes, this is what Mr. QTIL gave me. That seals the deal. And these cases are all designed to be sealed. There were three transactions in this case. Only one was charged substantively because it's the only one that was caught on audiovisual. The other two, one of them had only audio and the other one didn't have any recording, and the government didn't prosecute that because it wasn't a wrapped-up case. These are designed to be wrapped-up cases. That's why the control procedures are used and so forth. But there is a hole in this case because the government didn't want to use the witness that it had. It used a substitute witness. Before time runs out, could you just talk about the other issue of the defense not having a chance to put on your full defense because of the other witness you wanted to call? Mr. Boesel, who was in the courthouse, as a matter of coincidence, and someone that Mr. QTIL knew, Mr. Boesel would have testified that in conversations that he had with Ms. McIntyre, she told him that she had arranged to have buy money stolen from her. They used the term robbed, but I don't think any force was used. She conspired with the purported sellers to surrender the money without getting any drugs. That's something that she was doing around that time. That is, the first known occasion of that was in November, and this transaction was in October of 2009. But this is evidence that Ms. McIntyre was inclined to and knew how to beat this control system. Agent Wood, in his testimony, admitted this, and the government admits that this happened at least three, probably four times, including once possibly with Mr. QTIL. And that witness, what Mr. Boesel would have testified to was how that worked. In other words, the mechanism, the way that Ms. McIntyre was able to circumvent the control system would have added to the circumstantial case that she did so in this occasion, although in a slightly different way, probably. So that was testimony that Mr. Boesel was available, he was in the courthouse. He could have testified to that. The judge mistakenly thought that the only question that he could testify to was the credibility of Ms. McIntyre. That's not the case. Her credibility was clearly destroyed, was nonexistent, as the judge said, and there's no contest about that. But her inclination and willingness and ability to beat the control system was a central element, that is, of Mr. O'Kudo's defense. That was his defense, that she knew how to beat the system and that she did because she had an incentive. She thought he should be in jail. And so she set him up. He sold her counterfeit drugs and she substituted real drugs for it. I'd like to address one other issue, and that is on the weight, the sentencing issue regarding the weight, particularly the weight of the heroin, which the PSR put to the judge as being the amount of 9.6 grams on the October 1st transaction being supported by trial evidence. The only trial evidence regarding the weight of that particular substance was 7.2 grams that the government's chemist testified to. That difference of 2.4 grams is the difference between the 62 that Mr. O'Kudo was held responsible for and 59.6, which would have dropped his base offense level or his offense level from 22 to 20. Thank you. Good morning, Your Honors. May it please the Court. Kelly Lawrence for the United States. Starting with the drug weight contention that the defendant raised, the district court did not err by relying on the drug quantities set forth in the PSR to accurately estimate the amount of drugs that the defendant sold to the cooperating witness in this case. The PSR represented that the drugs were tested by the DEA drug lab, and those amounts were 9.2 grams for the first transaction, the uncharged October 1st transaction, and 29.6 grams for the charged October 5th transaction. Those amounts were not disputed by the defendant. He simply denied those transactions. The first one that was not charged had occurred. There's no suggestion in the record that the PSR's statement of the weights was unreliable or inaccurate in any way, and the court was correct in choosing that higher weight, which represented the first test in the original sample provided to the DEA drug lab, as the most reasonable and accurate estimate of the weight of the drugs in this case. Second, regarding... Counsel, is that weight that was represented in the PSR directly at odds with the evidence at trial? That was the, excuse me, I understood that to be the representation of counsel, that there was a direct conflict between the representation in the PSR and the evidence that was presented at trial. Is that not correct? The weights are different, but they're not in conflict. When you look at the trial testimonies, the trial testimony of the chemist who retested the samples, that chemist at trial explained that when you retest a sample, some of it is used up in the testing process. So the idea that the test, original test, is higher than the retest is not at odds with. It's simply different, and it was explained by the chemist at trial. Regarding the defendant's... Yes. Is that relevant to the argument you're making now? In other words, everything you say is true, even if we assume Exhibit 10 was not in the record? Or is the PSR dependent somehow on... The government's position is that Exhibit 10 is in the record. It was referred to at the sentencing exhibit, as we explained in the brief, and in our opposition to the motion to strike that exhibit. Nevertheless, the information contained in Exhibit 10 is represented in the PSR, and there's been no suggestion that that number, that that test was inaccurate in any way. So without any countervailing evidence to suggest that that number in the PSR is wrong, and the government understands the defendant's claim to be not that it was wrong, but that the trial testimony should be used instead. So to the extent that the PSR weight is really unchallenged, it can stand alone and support the district court's finding, even if the actual drug certificate is found not to be part of the record. Turning to the defendant's claim regarding the... His Sixth Amendment claim regarding Victor Bizzell, the witness that he wished to call at trial, there was no error, no abuse of discretion, and no Sixth Amendment error in the district court's decision to prevent that witness from testifying. As was explained at trial, the defendant asked to have that witness come in to testify, not just about what he had done regarding this cooperating witness and their alleged fake robbery of drug money, but he wanted that witness to testify about the cooperating witness's other interactions, perhaps with the defendant and others, and how she had staged fake drug robberies and buy money robberies. That testimony would have been an admissible hearsay, as the district court found, and moreover, to the extent that it was offered to impeach the cooperating witness further, it was entirely cumulative of evidence that was already in the record. And the defendant had a right to present his defense, and he was able to do that through a listing testimony from the agent regarding the fact that the cooperating witness had, in fact, on three different occasions, including once with the defendant, which the judge was aware of from pretrial filings, had been robbed of her drug money in controlled buys with the DEA. So there was no error in that respect. And finally, regarding the defendant's Sixth Amendment confrontation claim, as the court correctly noted, the defendant's claim here is more of a backdoor sufficiency argument than it is truly a confrontation claim. The argument that he makes is that the government could not have proven, beyond a reasonable doubt, that he was guilty of this heroin transaction without proving that the actual drugs in the car, that he was seen handing the cooperating witness in the car, were actually the drugs that the cooperating witness gave to the agent at the end of the buy. There was ample evidence in the record to support that conclusion. There was surveillance by all of the officers. They searched the cooperating witness before and after the buy. They had eyes and ears on her throughout the entire transaction. She never left the car. No one else got into the car besides the defendant. She made no other stops, and they also were able to listen to the transaction as it occurred. All of that evidence provides a basis for the judge in this case to conclude, beyond a reasonable doubt, that the defendant committed the crime as was charged. And what's the significance in your view of the debriefing? The debriefing testimony came in a very different context than the challenge testimony here. When that was mentioned in the trial transcript, the agent was describing the control procedures generally, and then he was also laying a foundation for the admission of the drugs and the recordings. So he was simply describing what he had done, and all that he said was, I debriefed her. And regarding the court's question of whether those reports are in the record, one of the reports is in the record regarding the September 29 cocaine transaction. That was an exhibit to Document No. 138, which was the government's response to one of the motions in Limine. The other reports for the other two transactions were produced in discovery, according to the letter that was filed with the court. It's Docket No. 10, the automatic discovery letter that was filed. The attachments are not part of that letter, but it says that they were handed over. And in those reports, and you can look at Document No. 138, its first exhibit, the September 29 transaction, it doesn't contain an explicit statement that the CW said, these are the drugs that the defendant gave me. It's just simply a recounting, a summarization of what occurred, what the officers did when she met with them at the meeting location, and what she described to have happened during the controlled buy. No further questions? Thank you very much. Thank you.